## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Oahn Nguyen Chung, Individually and as Administratrix of the Estate of Lisa Tam Chung; Liem Chung; Loren Daily; Ollie Daily; Patricia Daily, ) ) ) ) | Civil Action No.: |
| Plaintiffs, ) ) | COMPLAINT |
| v. ) ) | Plaintiffs Demand a Trial by Jury |
| StudentCity.com, Inc., d/b/a GradCity.com, d/b/a SpringBreakDiscounts.com, d/b/a Leisure Tours, d/b/a Sun Coast Vacations, d/b/a Spring Break Travel, ) ) ) ) ) | |
| Defendant. ) ) | |

### PARTIES

1.        Plaintiff Oahn Nguyen Chung is a resident of the State of Texas and resides at 3318 Willouby Drive, Grand Prairie, Texas, 75052.   She is the duly appointed Administratrix of the Estate of her daughter, the decedent, Lisa Tam Chung, pursuant to an order issued in Cause Number PR-10-675-3 by the Probate Court No. 3 of Dallas County, Texas, on May 26, 2010.   She is also the duly appointed Administratrix of an Ancillary Estate of Lisa Tam Chung in the State of Massachusetts pursuant to G.L. c. 199A and pursuant to an order of the Suffolk County Probate and Family Court, Docket No.: 10P1216.  She sues in her personal and representative capacities.

2.        Lisa Chung was born September 16, 1989.  She died in Dallas, Texas, on June 10, 2008.  At all times relevant to this complaint, Lisa Chung was a resident of 3318 Willouby Drive, Grand Prairie, Texas, 75052.

1

3.     Plaintiff Liem Chung is the father of the decedent, Lisa Tam Chung, and the husband of Plaintiff Oahn Nguyen Chung. He is a resident of Texas, residing at 3318 Willouby Drive, Grand Prairie, Texas, 75052.

4.     Plaintiff Loren Dailey is a resident of Texas, residing at 715 Caspan Way, Grand Prairie, Texas 75052. Loren Dailey's date of birth is July 7, 1990.

5.     Plaintiffs Ollie and Patricia Dailey are residents of Texas, residing at 715 Caspan Way, Grand Prairie, Texas 75052. They are the parents of Plaintiff Lisa Dailey.

6.     Defendant StudentCity.com, Inc. (SSC), doing business as GradCity.com, is a Delaware corporation with its principal place of business at 8 Essex Center Drive, Peabody, Massachusetts 01960-2959, Essex County. StudentCity.com is registered as a foreign corporation, identification number 043491393, doing business in the Commonwealth of Massachusetts under Massachusetts General Laws c. 181 §§ 3 & 4, as amended. StudentCity.com's Registered Agent in Massachusetts under the provisions of G.L. c. 181 §§ 4 & 4A is CT Corporation Systems, 155 Federal Street, Suite 700, Boston, Massachusetts 02110, Suffolk County.

## JURISDICTION AND VENUE

7.     This action seeks damages under the Massachusetts Wrongful Death Statute or other applicable law on behalf of the plaintiffs, Oahn Nguyen and Liem Chung, and the heirs, beneficiaries, and next-of-kin of Lisa Tam Chung and damages on behalf of the Estate of Lisa Tam Chung. The action seeks damages under Massachusetts or other applicable law for plaintiffs Loren, Ollie, and Patricia Dailey. The action arises from duties to all plaintiffs that Defendant culpably breached. Lisa Dailey and Lisa

Tam Chung were high school students who placed themselves into the care of Defendant for purposes of a celebratory graduation trip to Cancun, Mexico. On that trip, Lisa Chung was killed and Loren Dailey was injured on a June 7, 2007 snorkeling excursion sponsored by SSC when a boat struck a reef and began to sink. The death and injuries were proximately caused by the fault of Defendant SSC.

8.      Personal general jurisdiction exists over SSC because it is registered to do business in the Commonwealth of Massachusetts as a foreign corporation under the provisions of G.L. c. 181; it regularly, persistently, and continuously conducts business in this Commonwealth; it has a resident agent in this Commonwealth; and it derives substantial revenue from goods or services generated from its offices in this Commonwealth.

9.      This Court has Diversity of Citizenship jurisdiction over this action pursuant to 28 U.S.C. § 1332 because all plaintiffs are residents of Texas and defendant SSC is a Delaware corporation with its principal place of business and nerve center in Massachusetts; and the matter in controversy exceeds seventy-five thousand ($75,000) dollars exclusive of interest and costs.

10.     Venue in the District of Massachusetts is proper pursuant to the provisions of 28 U.S.C. § 1391(a)(2) & (3). Pursuant to Local Rule 40.1(D), assignment to the Eastern Division is proper because SSC is located in Essex County.

### SIGNING UP FOR THE TOUR

11.     In the spring of 2008 Loren Dailey and Lisa Chung were both seniors at Grand Prairie High School in Grand Prairie, Dallas County, Texas.

12.     Both Lisa Chung and Loren Dailey were successful students, ranked

3

academically in the top 10% of their graduating class, and graduated *cum laude*.

13.     In the fall of 2007 Loren Dailey was contacted by Daisy Reyes, acting on behalf of SSC.

14.     At all times relevant to this complaint, Daisy Reyes was an agent of SSC acting within the scope of her agency.

15.     Loren, her father, and Daisy Reyes first met in person at a Starbucks in Grand Prairie.

16.     Reyes told Loren that Reyes had seen a profile of Loren in the Dallas Morning News identifying Loren as a "good kid."

17.     Reyes told Loren that Reyes worked for a company, subsequently identified as SSC, that operates trips for seniors and that Loren could earn a free trip for herself if she could recruit fifteen of her friends to take a trip.

18.     Loren met with Reyes at least three times to discuss the proposal Reyes had made.

19.     One meeting occurred at Tom's Mongolian Grill in Grand Prairie, Texas. Several other persons attended, including plaintiff Patricia Dailey and other parents of students who might want to go on the trip.

20.     At this meeting, parents asked questions about safety.  Reyes responded that SSC staff would be at all events and that trip participants were not permitted to go anywhere unaccompanied.

21.     Reyes also passed out promotional materials from SSC.

22.     SSC promotional materials made available to plaintiffs by SSC promise that at every SSC event, SSC staff is present "to assure that everyone is having a great and

responsible time.  [SSC] is available to you to make sure you get the service you deserve."

23.     SSC promotional materials made available to plaintiffs by SSC urge trip participants to "[c]heck with [SSC] staff for guidance on the cheapest, easiest, and most reliable form of transportation in your specific destination."

24.     SSC promotional materials made available to plaintiffs by SSC note that SSC will provide "[o]n site staff at all events—beginning to end," and "24 hour onsite medics."

25.     SSC promotional materials made available to plaintiffs by SSC note that SSC staff is onsite "at every event we host from beginning to end."

26.     SSC promotional materials made available to plaintiffs by SSC provide:

GradCity is the only company to include a "Parent Approved" program.  This encompasses a program with years of experience in working with parents across the country.  We have the largest staff-to-student ratio and our 24 hour staff is there to give you the piece of mind you need.  GradCity prides itself in delivering 100% total customer satisfaction before, during and after each student vacation.   Our mission is to deliver fun-filled, high quality experiences that create life long memories for each student that travels with us.  GradCity is a proud member of the Safe Travels Foundation which is an excellent resource for travelers.

27.     SSC promotional materials made available to plaintiffs by SSC provide:

Why GradCity.com is the number one choice—detailed departure

meetings; departure information packet; ratio of one staff member to every 25 students; optional school/group chaperones; onsite airport arrival reps; extensive onsite orientation; 24 hour onsite parent/student assistant center; GradCity student wristband which provides our travelers with exclusive relationships and discounts; exclusive event and activity schedule; onsite staff at all scheduled events—beginning to end; hotel lobby representatives; 24 hour onsite medics; relationships with local American Certified Hospitals.

28.     Patricia Daily read these materials and discussed them with her husband.

29.     Patricia and Ollie Daily discussed concerns about safety on a trip.

30.     Relying on SSC's representations about supervision and safety, they gave permission to Loren to take the trip.

31.     Oahn Nguyen Chung and Liem Chung were concerned about the safety of Lisa Chung on the trip, as it would be her first trip away from home not accompanied by her parents.

32.     Oahn Nguyen Chung and Liem Chung do not speak or read English well.

33.     Oahn Nguyen Chung and Liem Chung discussed safety with Lisa.

34.     Lisa discussed with them representations SSC had made about safety and told them adult representatives of SSC always would be supervising the trip participants.

35.     Lisa Chung required the permission of her parents to go on the trip

36.     Loren Daily required the permission of her parents to go on the trip.

37.     All plaintiffs relied on representations by SSC regarding safety and supervision.

38.     Plaintiffs' reliance on those representations was reasonable.

39.     The kind of supervision described in these representations was a precondition of Loren Daily and Lisa Chung seeking parental permission to go on the trip.

40.     The kind of supervision described in these representations was a precondition of parental assent to Loren Dailey and Lisa Chung going on the trip.

41.     At some point Daisy Reyes was replaced by Christy Ayles.

42.     At all times relevant to this complaint, Ayles was an agent of SSC acting within the scope of her authority.

43.     Loren met with Ayles at least one time.

44.     Loren attempted to recruit fifteen students for the trip.

45.     Loren became disaffected with SSC and felt that SSC customer service was poor, in part because her phone calls were not returned.

46.     When Loren was unable to recruit fifteen students she asked SSC to discount the cost of her own trip.  SSC offered Loren a discount of 20%.

47.     On or about October 26, 2007, Lisa Chung signed an SSC Customer Agreement.  A copy of that agreement is attached as Exhibit A and is incorporated by reference.

48.     On or about February 5, 2008, Loren Dailey signed an identical SSC customer agreement.

49.     The SSC agreement notes that it is not intended to be a complete description of all terms and conditions applicable to the trip.

50.     A complete set of terms and conditions, as referenced in the SSC customer agreement, is attached as Exhibit B and is incorporated by reference.

51.        These terms and conditions include an arbitration clause.

52.        That arbitration clause provides, in part, that there "will be judicial review of the arbitrator's decision if either side can show plain error in the application of law or be able to show an abuse of discretion with respect to factual findings."

53.        The provision regarding judicial review is material to the arbitration clause.

54.        The provision regarding judicial review is not severable from the arbitration clause.

55.        The provision regarding judicial review expands the scope of review permitted by the Federal Arbitration Act.

56.        Such an expansion of judicial review has been found to be an impermissible attempt to expand jurisdiction by agreement.

57.        The arbitration clause is not enforceable against any plaintiff.

## THE TOUR AND THE INJURIES

58.        Eight Grand Prairie students, including Loren Dailey and Lisa Chung, ultimately made the trip.

59.        The students left Dallas by air on June 5, 2008, and arrived in Cancun, Mexico, the same day.

60.        Despite SSC assertions that students always would be supervised, students, including Lisa and Loren, without supervision walked to a restaurant for dinner and took a bus to a Wal-Mart to purchase supplies.

61.        Despite SSC assertions that students always would be supervised, students, including Loren and Lisa, went to a night club where some students, but not Lisa or Loren, consumed alcoholic beverages.

62.     Daisy Reyes had promised Mrs. Dailey that exactly this kind of unsupervised activity would not happen.

63.     On June 7, 2008, Loren Dailey and Lisa Chung, as an optional part of their trip at extra cost, both took a snorkeling excursion operated by SSC.

64.     Upon arrival in Cancun, SSC had warned Loren, Lisa, and other students not to book optional tours operated by other vendors but to book tours operated by SSC.

65.     On the morning of the snorkeling tour an agent of SSC transported Lisa, Loren, and other students to a marina to begin the excursion.

66.     That agent of SSC departed and no agent of SSC was present subsequently before or during the excursion.

67.     The vessel used for the excursion, the Sea Star, was a catamaran described by Mexican authorities as "a small fiberglass vessel" and was commonly used to carry members of the public.

68.     Upon information and belief, SSC did not supervise loading of SSC trip participants onto the vessel.

69.     Upon information and belief, SSC did not check whether the vessel had sufficient capacity to accommodate SSC trip participants.

70.     Upon information and belief, SSC did not assure that captain of the vessel was qualified to operate the vessel on this trip.

71.     Upon information and belief, SSC did not assure that the crew of the vessel was qualified to operate the vessel on this trip.

72.     Upon information and belief, at all times relevant to this complaint SSC knew that it would not provide supervisory services as described in paragraphs 67-70 and in

its promotional literature.

73.        At least 120 SSC trip participants were loaded onto the vessel.

74.        In a sequential sign-up sheet, Loren Dailey was number 125 to sign in, with many other students waiting behind her.

75.        When the vessel set off it had at least 210 persons on board.

76.        Mexican authorities approved the vessel for occupancy by 80 passengers and 3 crew members in the waters in which it was operating.

77.        No on-duty SSC staff were on-board the vessel.

78.        One SSC staff person was aboard the vessel, but only in her individual capacity for her own recreational purposes.

79.        The captain of the vessel had never before operated a vessel of this size in these waters and was unfamiliar with the waters.

80.        The vessel collided with a coral reef, took on water, and partially sank.

81.        Lisa and Loren, from the top deck of the vessel, viewed crew members bailing out the bottom of the boat with trash buckets.

82.        Lisa and Loren watched the back of the boat sinking.  As they did so, a large number of people moved from the back to the front of the boat and the boat made creaking sounds.

83.        No SSC personnel and no crew of the vessel provided direction to passengers.

84.        Crew members deserted the vessel.

85.        Lisa and Loren found and put on life preservers.

86.        The life preservers were not standard and were difficult to put on.

87.        As Lisa and Loren sat on the deck with life preservers on they saw rescue

vessels appear.

88.     The rescue vessels were primarily private craft coming to the aid of the floundering Sea Star.

89.     Boys from the Grand Prairie group appeared and told Lisa and Loren to jump into the water.

90.     Lisa Chung knew how to swim.

91.     Loren Dailey did not know how to swim.

92.     Lisa and Loren went to the lower deck.

93.     The boat was listing at about a fifteen-degree angle, with the back of the boat submerged.

94.     Lisa and Loren went to the front of the boat and opened a door.  Lisa jumped from this opening into the water, a distance of about eight feet.

95.     Loren saw Lisa in the water holding a rope that ran in the water from a rescue vessel to the catamaran.  Lisa told Loren to jump.

96.     Loren jumped into the water and also held onto the rope.  For about a minute Lisa and Loren were about three feet apart from each other, each holding onto the rope.

97.     At this time, the rescue vessel was three to four car lengths away from the catamaran.

98.     The rescue vessel was a small private boat, no more than fourteen feet in length.

99.     The rope began to rise from the water.  Loren held onto the rope as long as she could, until her body was out of the water to her waist.  She was then unable to hold on, and let go.

100.     Loren then found herself beneath a boat with a white hull.  As her life preserver lifted her into the bottom of the boat she looked over and saw Lisa.

101.     Loren then closed her eyes, believing she was going to die.

102.     Loren then found herself coughing up water on a boat and hearing "Get up! Come on!"

103.     Loren saw that a life preserver was around her feet.

104.     Loren saw other people on the boat but no other Grand Prairie students.

105.     Loren asked, with regard to Lisa, "Where is my best friend?"

106.     Loren was taken back to shore where she saw another Grand Prairie student and told him that she needed him to go find Lisa.  She then learned that Lisa had been brought to shore.

107.     Loren was hospitalized in Cancun, suffering from extremely bad chest pain, shortness of breath, and bruising.

108.     Loren was subsequently admitted to Cook Children's Hospital in Ft. Worth, Texas and treated for a "near drowning experience."   Loren also had subsequent counseling.

109.     Lisa was hospitalized in Mexico.

110.     Lisa's mother was told by Mexican hospital officials that Lisa was brain dead.

111.     Lisa subsequently died on June 10, 2008, at a hospital in Texas.

112.     The harbor master, in a preliminary report, cited "considerable imbalance on the stern-side of the catamaran due to the inadequate concentration of passengers in the boat between the middle section and the stern," as a probable cause of the collision.

113.     Mexican government authorities concluded that "[t]he vessel's imprudent

overload" and "[t]he negligent performance of [the captain]" were causes of the collision.

## CLAIMS

### COUNT I

**THE PLAINTIFFS' CLAIMS AGAINST THE DEFENDANT, SSC, PREDICATED ON NEGLIGENCE**

114.    Plaintiffs reassert, re-allege, and incorporate by reference paragraphs 1-113 as though set forth herein.

115.    SSC owed a duty to exercise reasonable care to provide for the safety of Lisa Chung and Loren Daily during all SSC operated events and activities during the Cancun, Mexico, trip, including, but not limited to, providing supervision of the snorkeling excursion to ensure their safety while boarding and on the vessel.

116.    SSC negligently failed to operate and supervise the snorkeling excursion to ensure that the vessel was reasonable safe and operated with reasonable care including, but not limited to, ensuring that the vessel was adequately equipped and capable of safely transporting and accommodating the SSC trip participants and ensuring that the vessel's owner and crew were competent and qualified to safely operate the vessel.

117.    As a direct and proximate result of SSC's negligent breaches of duty, Loren Dailey suffered personal injuries, Lisa Chung was killed, and all other plaintiffs suffered harm.

WHEREFORE, the Plaintiffs demand judgment against SSC for damages sufficient to fully and fairly compensation them for their injuries, together with interest and costs, and such other relief as the Court deems appropriate.

## COUNT II

### THE PLAINTIFFS' CLAIMS AGAINST THE DEFENDANT, SSC, PREDICATED ON GROSS NEGLIGENCE AND WILLFUL, WANTON, AND RECKLESS CONDUCT

118.    Plaintiffs reassert, re-allege, and incorporate by reference paragraphs 1-117 as though set forth herein.

119.    SSC's failure to operate and supervise the snorkeling excursion to provide for the safety of all SSC's participant passengers , including Loren Dailey and Lisa Chung, constituted gross negligence and willfull, wanton, and reckless conduct.

120.    As a direct and proximate result of this conduct, Loren Dailey suffered personal injuries, Lisa Chung was killed, and all other plaintiffs suffered harm.

WHEREFORE, the Plaintiffs demand judgment against SSC for punitive and other damages, together with interest and costs, and such other relief as the Court deems appropriate.

## COUNT III

### CLAIM OF THE PLAINTIFF, OAHN NGUYEN CHUNG, ADMINISTRATRIX OF THE ESTATE OF LISA TAM CHUNG, FOR CONSCIOUS PAIN & SUFFERING

121.    Plaintiffs reassert, re-allege, and incorporate by reference paragraphs 1-120 as though set forth herein.

122.    As a result of the personal injuries sustained by Lisa Chung prior to her death caused by the negligence of SSC, she consciously suffered pain, both physical and emotional.

WHEREFORE, the Plaintiff, Oahn Nguyen Chung, Administratix of the Estate of

Lisa Tam Chung, demands judgment against SSC for damages for conscious pain and

suffering sufficient to fully and fairly compensation the plaintiff, together with

interest and costs, and such other relief as the Court deems appropriate.

PLAINTIFFS DEMAND TRIAL BY JURY ON ALL COUNTS OF THIS COMPLAINT

Dated: June 7, 2010

Respectfully Submitted,

**KREINDLER & KREINDLER LLP**

By:

  /s/ Anthony Tarricone
Anthony Tarricone, BBO # 492480
atarricone@kreindler.com
Joseph P. Musacchio, BBO # 365270
jmusacchio@kreindler.com
Kreindler & Kreindler LLP
277 Dartmouth Street
Boston, MA 02116-2805
(617) 424-9100

  -and-

Noah Kushlefsky, Esq (NK6272)
(*pending Pro Hoc Vice admission*)
100 Park Avenue
New York, New York 10017
(212) 687-8181
nkushlefsky@kreindler.com

  -and-

John Vail, Esq. (DC Bar No. 461512)
(*pending Pro Hac Vice admission*)
Center for Constitutional Litigation, P.C.
777 6th Street, NW Suite 520
Washington, DC 20001
(202) 944 2887
john.vail@cclfirm.com

15